[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
RE: DEFENDANT'S MOTION TO MODIFY CODED NO. 132 AND PLAINTIFF'S MOTION FOR CONTEMPT CODED NO. 133
Many of the facts that give rise to the above two motions are not in dispute. The parties were married on June 16, 1956. They had four children issue of the marriage, one of whom was a minor at the time of dissolution, who was born on September 8, 1963. The marriage between the parties was dissolved on August 12, 1981. An agreement entered into between the parties dated August 12, 1981, was approved by the court and incorporated by reference into the decree of dissolution. That agreement provided in ARTICLE IX: ALIMONY as follows:
 9.1 The Husband shall pay to the Wife, as unallocated alimony and support until September 8, 1981, and thereafter as alimony, the sum of $30,000 per year, which shall be payable in bimonthly installments on the first and fifteenth day of each month, in advance, commencing August 15, 1981, in the amount of CT Page 7122 $1,250, which payment shall continue until the death of the Husband, death of the Wife, her remarriage, or her regular cohabitation with an unrelated male. The Agreement is predicated on the Wife's nonincome producing status. In the event that the Wife earns income as a result of employment, in an amount greater than $10,000 per year, then alimony payments shall be predicted on the following formula: The gross earnings of the defendant plus the gross earnings of the plaintiff in excess of $10,000 shall be combined, and 35 percent of that total sum shall become the alimony payment; from that amount shall be subtracted the sums of money that the plaintiff earns in excess of $10,000 and the remaining sum shall be that alimony which shall be payable by the defendant to the plaintiff. (Example — if the defendant's gross taxable income from employment is $80,000 and the plaintiff's gross taxable income from employment is $15,000, that would be a total of $80,000 plus $5000 (plaintiff's excess earnings); 35 percent of that would be $29,750 less $5000 earned by the plaintiff would leave a balance of $24,750 by way of alimony to be payable from the defendant to the plaintiff.)
 9.2 If and when the husband retires that shall be deemed a substantial change in circumstances not contemplated within the provisional formula of the previous paragraph. The parties at that point will renegotiate the alimony payment to be made and if, in fact, they are unable to agree with regard to the same, the matter shall be submitted to the Superior Court for a hearing and determination. The alimony payment shall take into consideration and recognize the assets that have been previously distributed to the parties by virtue of this agreement.
 9.3 The Husband's maximum obligation for alimony payments, however, shall be limited to $30,000 per year.
On the date of dissolution, the plaintiff was unemployed. Her only source of income was rental income with a gross of $122.09 weekly. Not included is the rental income received from the Cape Cod property because the property is run at a slight deficit each year and does not produce any income to the parties. There was a family home located at 105 Branchville Road, Ridgefield, Connecticut. The plaintiff estimated the value of that home to be between $450,000 and $550,000 with a mortgage balance of $20,000. The defendant valued the home at $450,000 with a mortgage balance of $20,000. There was also a Cape Cod house jointly owned by the defendant, the plaintiff and two other persons. The plaintiff valued that property at $130,000 with a mortgage balance of $21,700. The defendant valued the property at $335,000 CT Page 7123 with a mortgage of $76,000. The plaintiff listed a second Cape Cod house jointly owned by the defendant, the plaintiff and two other persons with an estimated value of $240,000 and a mortgage of $51,600. She also listed a lot in Jamaica with a $5000 value, as well as an Aruba owned time share with an estimated value of $5000. The defendant also listed the Jamaica lot with a value of $5000. The plaintiff had a 1979 Oldsmobile with a value of $3000 and a loan balance of $360 and an equity of $2640. She had furnishings at the family home with an estimated value of $30,000 to $40,000. She had a savings account that she listed as being her mother's account at Chase Manhattan with an estimated value of $5000 and two shares of Village Bank and Trust stock with an estimated value of $50. She also owned a policy on the defendant's life in the face amount of $28,000 and a cash value of approximately $3000. She had liabilities that totaled $32,863.13. Her basic monthly expenses, including the mortgage on the family home, totaled $4,410.38 for a weekly amount of $1,025.66.
On the date of dissolution, the defendant owned a 1979 Jeep with a value of $5500 and a loan balance of $2158. He had miscellaneous personal property with a value of $20,000 and dental equipment with a value of $7000. He had savings accounts totaling $1100. He had stocks and bonds with a total value of $81,400. He also showed the time share in Aruba to have a value of $5500 and owned one share in the Ridgewood Country Club with no value. He had liabilities totaling $18,800 and basic weekly expenses of $1,426.22. He had gross weekly income of $1,366.66 and net weekly income of $775.21.
ARTICLE X of the Agreement provided in part as follows:
 10.1 The parties are the joint owners of property located at 105 Branchville Road, Ridgefield, Connecticut. The property shall be placed on the market for three months with an initial listing price of $500,000. The parties will accept any offer which is within five percent (5%) of the listing price. If, in fact, the property has not sold within a subsequent period of three (3) months, then the parties will reconsider the listing price in accordance with the then fair market value of the same. There shall be a reconsideration of the listing price every three (3) months until such time as the property is sold. If requested to do so, the parties shall take back a purchase money mortgage at an interest rate not less than twelve percent (12%) with a term of no more than five (5) years and payments based upon an CT Page 7124 amortization schedule of not more than twenty (20) years for an amount not in excess of twenty percent (20%) of the purchase price. The parties' ownership interest in the purchase money mortgage and note shall be seventy percent (70%) for the Wife and thirty percent (30%) for the Husband. From the gross proceeds of the sale of the property, there shall be paid the following obligations: the first mortgage, real estate taxes, if any, usual closing costs and adjustments including attorney's fees, the pool debt in the amount of approximately $13,000 to Connecticut National Bank, an I.R.S. lien for 1979 for unpaid Federal Income Taxes in the amount of approximately $7,700 and an IRS lien for 1980 in the amount of approximately $11,000 for unpaid Federal Income Taxes, and the net remaining proceeds shall be divided as follows: seventy percent (70%) to the Wife and thirty percent (30%) to the Husband. In the event that the Wife receives a percentage of the commission on the sale of the property, it shall be added to the proceeds before distribution of the net remaining proceeds to the parties.
 10.2 Each party shall assume and be responsible for fifty percent (50%) of the capital gains tax which may be due; each party shall have the option to take advantage of any credits accruing to them by virtue of a subsequent purchase of a residence in accordance with I.R.S. regulations or other means of deferral.
 10.3 The parties are the joint owners of two houses and properties located at Cape Cod, Massachusetts. The parties and other joint owners will agree that the smaller house (Lot C) shall be sold. It is presently on the market for sale. After the payment of the mortgage, taxes, usual closing costs and adjustments and capital gains, if applicable, the net proceeds to be derived from the sale of that property (estimated at approximately $40,000) shall be held by the parties to this action in a separate trust account and said proceeds shall be used for the educational expenses to be incurred by the three Dionne children who remain in college: the son Josh who has one year remaining at college; the daughter Susan who has two remaining years; and the daughter Denise four remaining years. The parties will invade said trust account to the extent, if necessary, of $6000 per year for the educational expenses of each of the children. In addition, it is anticipated that each of the children will apply for a Federal student loan in the amount of $2500 per year. To the extent that the aforesaid sum of $8500 for each child shall not be sufficient for their educational expenses, the parties will equally share the remaining costs of the undergraduate educational expenses of each child so long as that child is a full-time student. Provided, however, neither parent shall CT Page 7125 be required to expend more than $1000 per year per child for said educational expenses. When all of the children have completed their college educations or five years from date, whichever shall first occur, any remaining funds in the trust account shall then be divided equally between the Wife and Husband. Each child shall be responsible for repayment of his/her student loans.
 10.4 The larger house on Cape Cod has a total equity of approximately $76,500 for the Husband and Wife. The property is jointly owned with two other individuals. The wife shall have the option of purchasing the Husband's quarter interest in said property when the Ridgefield property has been sold. The Wife must exercise the option within 60 days of the Ridgefield property closing. The purchase price of the Husband's quarter interest in the Cape Cod property will then be determined by the following formula: the fair market value will be established and from that will be subtracted the pro rata balance on the mortgage, taxes, usual closing adjustments and real estate commission. Twenty-five percent of that value shall represent the Husband's interest in said property. In the event the parties cannot agree with regard to fair market value of the same, they will each appoint an appraiser who will appoint a third appraiser and the conclusion of the three appraisers shall be binding upon the parties. The Wife will, upon purchase of the Husband's interest, assume any responsibilities, rights and obligations which entail the ownership of this property, both with regard to encumbrances on the property and a certain partnership agreement entered into with the other joint owners of said property. The Wife will save the Husband harmless and indemnify him from any and all claims that may arise against him as a result of any obligations concerning this particular property, including, without limiting the generality of the foregoing obligations of the Husband under the promissory note secured by the mortgage on the premises. During the interim period of time, the Wife shall have exclusive occupancy of the time allocated to the owners and the Husband agrees he will refrain from using said Cape Cod property. In the event that the Wife chooses not to exercise her option to purchase said property, then the parties will endeavor to persuade the co-owners to place the property on the market for sale and they will equally divide the net proceeds to be derived from the said sale. During the period of time prior to the sale of the property, the parties will equally share the cost and/or profit to be derived from this property. In the event that the co-owners are not agreeable to a sale of said property, then the parties to this agreement will each continue to own a one quarter interest in the same until it can be liquidated, and they will equally share the CT Page 7126 profit, loss and/or time available to them as owners concerning said property. Both parties have read the agreement between Harry Neumann and Ernest J. Dionne, Jr. concerning the Cape Cod property.
 10.5 The parties are the owners of a vacant lot in Jamaica. The parties are the owners of a time share condominium in Aruba. The parties will have six (6) months within which to determine who shall be entitled to the ownership of which property or how they will share their interests in the same. If they are unable to agree during the six (6) month period, then both properties shall be sold at the earliest possible date for the first reasonable offer and the net proceeds shall be equally divided between them.
ARTICLE XI: PERSONAL PROPERTY 11.1 The Wife shall be entitled to the furnishings and personal possessions presently located in the family home, with the exception of those items listed on Schedule A hereto attached which shall become the property of the Husband.
 11.2 The Husband shall transfer to the Wife title to the 1979 Oldsmobile automobile which she is driving, free and clear of encumbrances.
 11.3 The Husband shall be entitled to retain all of the funds accumulated in his retirement plan including the Partner's Fund, the Oppenheimer Fund and Selected American Shares with a total valuation of all of these assets in the approximate amount of $81,400.
ARTICLE XII: INSURANCE 12.2 The Husband has four life insurance policies with ALIMONY: (1) Policy #9158365, face valuation $28,856; (2) Policy #10315693, face valuation $75,000 and (3) Policy #9595109, face valuation $39,200. The Wife is the owner of Policy #968810 with a face valuation of $28,308 and a cash value of approximately $2400. She shall retain the ownership of said policy and be responsible for the premium payments concerning the same and she shall have exclusive rights to the cash value of said policy.
 With regard to the other three remaining policies, the Husband shall designate the Wife as the beneficiary of the same so long as his obligation to pay alimony continues. The Husband CT Page 7127 maintains full rights to substitute additional or other policies in satisfaction of his obligations hereunder as long as he maintains death benefits of not less than $140,000 payable to the Wife. Any cash value or dividends shall be the sole property of the Husband. He will pay the premiums with regard to these policies and he will furnish to the Wife evidence of the premium payments on a yearly basis at her request. He will not borrow against said policies nor encumber them in any way. To the extent that the premium payments by the Husband exceed the sum of $1750 per year, said excess premiums shall be treated as additional alimony and shall be includable in the Wife's gross taxable estate. The Husband, however, will not incur said additional premium obligations without notice to the Wife.
ARTICLE XIV: LIABILITIES 14.1 During the period of time prior to the sale of the Ridgefield property, the Wife shall have exclusive possession and control of said property. She will collect any rental income accruing to the ownership of said property. The Wife will pay the mortgage, taxes, insurance, necessary maintenance including lawn care, snow removal, electricity and heat concerning said property. To the extent that the aforementioned payments actually made exceed the sum of $1300 per month on an annualized basis the Husband will pay as additional alimony, one third of the expenses over and above the said $1300 per month until such time as the Ridgefield property has been sold. Said $1300 base will be increased on a dollar for dollar basis, for each dollar of rental income to be received in excess of $525 per month. Husband represents that all, except for Schedule B, payments for mortgage, taxes, insurance, maintenance, utilities and heat have been/will be made current through August 14, 1981. The Wife's obligation to assume payments for mortgage, taxes and insurance commences September 1, 1981; the Wife's obligation for payment of utilities, maintenance, etc., commences on August 15, 1981.
 14.2 In the event that major repairs become necessary, major being defined as any one event which costs in excess of $250, the parties will share the cost of the same in accordance with the 70/30 split. The Wife will not incur any bills for major repairs without first consulting with and obtaining reasonable consent from the Husband except in the case of emergencies.
 14.3 The Husband will maintain the family membership in the Ridgewood Country Club until January of 1982. The Wife will CT Page 7128 be responsible for her own club bills which are incurred from August 15, 1981 through January of 1982. In January of 1982, the Wife will be eligible to apply for membership in her own name in the club and the Husband's obligation to maintain the family membership shall cease.
 14.4 The Husband represents that prior to the sale of the Ridgefield property, he will continue to make regular monthly payments to Connecticut National Bank for the pool payments (in the amount of approximately $200 per month).
 14.5 The Husband shall pay, on behalf of the Wife, counsel fees in the amount of $3500, payable as follows: $1750 on October 12, 1981 and the remaining $1750 on December 12, 1981 or at the time of the sale of the Ridgefield property, whichever shall first occur.
 14.6 The parties have liabilities and obligations as set forth on Schedule B hereto attached. The parties also realize that there are no liquid funds at the present time for the children's educational expenses about to be incurred. Therefore, the parties will borrow the sum of $35,000, securing said loan by a mortgage on the Ridgefield property. From the proceeds of the loan will be paid the following: $18,000 for educational expenses for the three children for academic year commencing September 1981 through June 1982; an additional $5,669.18 for debts as shown on Schedule B; $3000 will be set aside in a special account to make the monthly mortgage payments concerning this mortgage until the mortgage has been paid or the funds expire, whichever shall first occur and the remaining $9000 shall be equally divided between the parties for the payment of the following obligations:
 HUSBAND
 Ridgefield Medical Group $ 306.00 Lou's Package Store 377.06 Pamby Motors 1,650.42
 WIFE
 Dr. Chambers $ 55.00 Columbia Medical Lab 18.37 NewCanaan Medical Group 249.50 Telephone 195.81 Craig Jewelry 84.22 CT Page 7129 Dr. Katis 1,300.00 Fair Cadillac 320.74
 When the Cape Cod property has been sold as set forth in Paragraph 10.3, $20,000 from the sale proceeds shall be used to reduce this second mortgage; the remaining proceeds shall go into the educational trust fund as previously set forth in Paragraph 10.3. When the Ridgefield property has been sold, each party will immediately pay one half of the remaining sum due on this second mortgage.
 I THE DEFENDANT'S MOTION TO MODIFY ALIMONY CODED NO. 132
The defendant seeks to modify the existing alimony order. The court finds the following additional facts regarding this motion.
The defendant is sixty-six years old. He has retired from his general dentistry practice that was in Ridgefield, Connecticut. He practiced dentistry for forty years. He retired on August 1, 1997, when his practice was sold. He was just under sixty-six years old when he sold his practice on August 1, 1997. He decided to retire since his practice was still viable and would be able to be sold and he was still healthy. He does health problems that include high blood pressure and hemochromatosis, which is a condition in which the blood retains iron. He was diagnosed with that condition in 1995. The treatment consists of him giving a pint of blood initially once a week for thirty weeks, and then once a month for several months. It is a genetic condition. He gets fatigued as a result of that condition. He sees a doctor every three to four months to check on his iron count. He decided to sell his dental practice in November or December of 1996. The practice was sold for $125,000 which was the opinion of value by the dental broker that he contacted. He paid the broker a 10 percent commission which resulted in his netting $112,500 from the sale of the practice on August 1, 1997. The $112,500 was initially put into a money market account. He has approximately $9000 left from that fund. The money was used for the following purposes: (1) purchase of an automobile for $21,000; (2) payment of $11,250 taxes from the sale; (3) payment of $3000 regarding his September, 1997 personal expenses; (4) payment of $2000 for his October, 1997 personal expenses; (5) payment of $7000 for his November, 1997 personal expenses. Approximately $4000 of the $7000 was used towards purchasing real estate in South Carolina; CT Page 7130 (6) $36,200 to complete the closing on the South Carolina real estate; (7) $3500 for his February, 1998 personal expenses; (8) $3500 for his March, 1998 personal expenses; (9) $4000 was deposited on March 23, 1998, into an IRA account; (10) $18,100 for payment of 1997 federal and state income taxes on March 31, 1998; (11) $3500 for his April, 1998 personal expenses. That leaves a balance of $9796.
The defendant presently has social security income of $305 weekly. He has interest of $9 weekly shown on schedule B of his financial affidavit dated April 24, 1998, and dividends of $18 weekly also shown on schedule B. His one liability is a Master Charge liability with a balance due of $1414. He owns property at 11 Lake Place North in Danbury, Connecticut with a total value of $175,000 and a mortgage of $76,202. He has a 50 percent equity in that property of $49,399.
The defendant resides at the 11 Lake Place North, Danbury Connecticut condominium with his present wife and her thirty-five year old son. The son does not pay any rental income. His wife is fifty-six years old. His financial affidavit shows stocks and bonds with a value of $82,405. That represents one-half of the total value of the stocks and bonds. None of the money from the stocks and bonds came from his present wife. Part of it came from the defendant's father. He has deferred compensation assets totaling $893,168. His deferred compensation assets totaling $893,168 earned approximately $75,000 in 1997. He will have to pay income tax on those funds when the money is withdrawn. He has accounts receivables from the sale of his business totaling $1900 of which approximately 20 percent are collectable. He still owns one share in the Ridgewood Country Club with a value of $500. He owns a 1997 Dodge with a value of $18,800 for which he shows a one-half equity of $9400. He also owns a 1995 Ford with a value of $12,100, a loan balance of $2892, and a 50 percent equity of $6404. The South Carolina land has a total value of $39,500. His one-half equity amounts to $19,750. The Danbury property was purchased mostly with the defendant's money. The South Carolina lot was purchased with the defendant's money in the name of the defendant and his current wife.
The defendant presently has life insurance in the total face amount of $220,000. The weekly cost for his life insurance is $82.
The plaintiff has liabilities totaling $16,968. She has CT Page 7131 interest income of $4.30 weekly, dividends/CAP bonus of $348.34 weekly, partnership income of $17.44 weekly and social security income of $116.88 weekly. She owns a condominium in Boynton Beach, Florida with a value of $68,500, a mortgage of $26,406 and an equity of $42,094. She has household furnishings with a value of $3500. She has a bank account at South Trust Bank with a balance of $5047. She owns stocks and bonds with a total value of $102,399 and deferred compensation plans with a total value of $679,187.
She has cataracts in one eye, glaucoma, and a bad back. She also has a foot problem and sclerosis rheumatism. The plaintiff was born on March 12, 1934.
The motion to modify was served upon the plaintiff in Florida by a certified process server on June 9, 1997.
The court finds that as a result of the defendant's retirement from the dental practice, there has been a substantial change in the defendant's circumstances. Section 9.2 of the Separation Agreement between the parties provides that if and when the husband retires, that shall be deemed a substantial change in circumstances not contemplated within the provision of alimony formula of § 9.1. The parties have been unable to agree regarding the alimony payment to be made. The court has taken into consideration and recognizes the assets that have been previously distributed to the parties by virtue of the separation agreement.
The court enters the following orders.
1. Alimony is reduced to $150 per week, retroactive to the date the defendant retired on August 1, 1997.
2. The defendant's obligation to maintain life insurance designating the plaintiff as beneficiary in a sum not less than $140,000 payable to the plaintiff is reduccd to $50,000. The defendant is responsible for the total premium required to maintain such life insurance.
3. The parties are ordered to exchange copies of their federal and/or state income tax returns by registered mail, return receipt or certified mail, return receipt for so long as there is any outstanding alimony order or any arrearage thereto. Such exchange is to take place within fifteen days after such CT Page 7132 returns have been filed.
 II THE PLAINTIFF'S MOTION FOR CONTEMPT CODED NO. 133
The court finds the following additional facts regarding this motion.
The defendant stopped paying alimony when he retired on August 1, 1997. As of that date the alimony order was $30,000 annually. As of April 24, 1998, the defendant had not paid any alimony to the plaintiff, including the alimony payment due for the month of August, 1997.
The court finds that the defendant has failed to prove inability to pay on his part. What the defendant has done in this case is the classic example of self-help.
The defendant did remain current-in his alimony from the date of dissolution until August 1, 1997. The court, in exercising its discretion, has considered the fact that the defendant was current in his alimony payments up to August 1, 1997, and is, therefore, not going to hold him in contempt of court. The court, however, is going to require him to pay counsel fees to counsel for the plaintiff arising out of the contempt motion. The court finds that the reasonable value of counsel fees related only to the contempt motion is $1200. The court enters the following orders.
1. The defendant is to pay counsel fees in the amount of $1200 by July 22, 1998.
2. All alimony arrearage is to be paid in full by July 22, 1998. In the event the parties cannot agree as to what the amount of that arrearage is, then the matter will have to be set down for short calendar hearing. In the event the alimony arrearage is not paid in full by July 22, 1998, then any unpaid alimony arrearages are to include interest at the rate of 10 percent per annum, commencing July 22, 1998.
Axelrod, J. CT Page 7133